Filed 9/27/23  P. v. Turner CA1/3

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>NICOL TURNER,<br><br>    Defendant and Appellant. | A166703<br><br>(Napa County Superior Court Case No. 21CR001214) |

Defendant and appellant Nicol Turner appeals from an order committing her to a state hospital under Penal Code section 1601, subdivision (a) (section 1601(a))[1] after she was found not guilty by reason of insanity (NGI) of various crimes.  She contends the trial court did not understand the scope of its discretion under section 1601(a) and failed to exercise its discretion to order outpatient placement.  We affirm the commitment order.

## FACTUAL AND PROCEDURAL BACKGROUND

### *The Underlying Offense and NGI Finding*

In May 2021, appellant was driving home with her young son.  She told her son to get out of the car and then sped into oncoming traffic to commit

---

[1]    Unless otherwise indicated all further statutory references are to the Penal Code.

suicide. Her car collided with another car; two passengers in that car, including a three-year old child, sustained injuries as a result.

According to her private therapist, appellant had not previously suffered from any type of severe mental health disorder. Appellant explained to her therapist that on the day of the offense she had become paranoid and psychotic and was suffering from auditory hallucinations and delusions. Appellant believed she had an adverse reaction to medication received for a medical procedure. She posited that the adverse reaction combined with several stressors (including loss of income, the end of romantic relationship, and challenges of home-schooling her son during the COVID pandemic) may have resulted in a major depressive episode with psychotic features.

In June 2021, appellant was charged with three counts of felony assault with a deadly weapon (§ 245, subd. (a)(1)); one misdemeanor count of cruelty to a child by endangering health (§ 273a, subd. (b)); and a special allegation of causing great bodily injury to a child under five years old (§ 12022.7, subd. (d)). Appellant, who had no prior criminal history, was not taken into custody but was placed on supervised release.

On September 9, 2022, appellant pled no contest to one of the felony assault with a deadly weapon charges and the misdemeanor cruelty to a child by endangering health charge and admitted the great bodily injury to a child under 5 years old allegation. The remaining charges were dismissed. Thereafter, the court conducted a sanity trial. Based on the psychiatric reports of two doctors, both of whom concluded appellant to be NGI, the court found appellant to be NGI and suspended criminal proceedings. The court ordered the matter referred to the Napa County Health and Human Services Agency, Mental Health Division's Conditional Release Program (CONREP)

2

for a placement report. Appellant remained out of custody on supervised release.

### *CONREP Placement Report*

On October 14, 2022, CONREP submitted its placement report to the court. After identifying the various sources for the report and appellant's underlying criminal charges, CONREP provided the following information from its September 2022 clinical interview with appellant: Appellant "presented herself well in the interview." She shared that she spent her time on her event planning business and volunteering at a homeless shelter; a weekly Kaiser intensive outpatient program; weekly private therapy; exercise; and religious services. Kaiser had diagnosed her with psychotic disorder, unspecified type, as well as attention deficit hyperactivity disorder, predominantly inattentive presentation. In terms of symptoms, appellant "noted occasional voices that do not cause distress, some paranoid thoughts, anxiety and feelings of depression." Appellant correctly identified her prescribed psychotropic medications.

The report referenced appellant's April 2022 doctor's report from her sanity trial, in which one of the doctors stated that appellant reported experiencing " 'delusional thoughts and paranoia. However, to a lesser degree than prior to the crime.' " She previously reported that she had continued to see " 'angel numbers' " which she looked up to determine their meaning. From this, CONREP concluded appellant's insight was "not yet linked to good judgment" because appellant followed up on delusional thoughts rather than dispelling them without action.

The report stated appellant's substance use was unknown. Appellant initially denied any substance use but later limited that to " 'non-legal' substances." She had tested positive for THC the day of her offense (in May

3

2021). In the April 2022 doctor's report from the sanity trial, the doctor noted appellant reported last using marijuana in May or June of 2021, as she had been instructed by the court to not use. In contrast, the February 2022 doctor's report from her sanity trial reflected that appellant admitted to occasional marijuana use, particularly to help with sleep. In addition, prior reports indicated that, before the offense, appellant drank wine ranging from twice a day to two or three times a week and that she had been a heavy drinker in the past but was no longer. A drug screen from August 2022 showed no positive test results. Appellant understood CONREP would require sobriety and random substance use testing.

The report summarized CONREP's interview with appellant's ex-husband, who lived out of state and had been the sole caretaker of their young son since the offense. The ex-husband expressed concerns about appellant's "very erratic and alarming" behavior prior to and since the day of the offense. Prior to the offense, appellant's mother had been staying with appellant and their son, but she left a couple of days before the offense "without, to his knowledge, notifying anyone of [appellant's] on-going behavior." According to the ex-husband, appellant had never apologized to their son for the experience she put him through and had not shown any remorse. Based on this, CONREP expressed concern that appellant lacked clear understanding and acceptance of her offense, which it considered a significant barrier to safe treatment in the community. CONREP attempted to reach appellant's mother to discuss appellant's "stable community functioning" but was unable to make contact.

The report summarized CONREP's interview with appellant's private therapist. The therapist shared her view that appellant "ha[d] no need for treatment intervention specific to her Instant Offense and CONREP, that she

4

bears no responsibility in it and that her participation in CONREP would not befit her educational and social standing." Based on this feedback, CONREP expressed concern that appellant's existing support network could impede rather than support her treatment progress in outpatient program. The therapist also failed to respond to requests for her clinical notes. As a result, it was "difficult to determine what, if any, treatment focus has been placed . . . on acknowledgement of her Instant Offense that she might effectively work to avoid a future offense."

Multiple attempts had been made to interview appellant's mental health care providers at Kaiser, but they had not returned calls. Limited to available records, the report stated that "CONREP was unable to locate any reference to acknowledgement of or treatment specific to [appellant's] Instant Offense." Further, according to CONREP, appellant's report that she attended intensive outpatient treatment at Kaiser weekly was "at odds" with her medical records, which showed she had not attended treatment since late May 2022 and did not show up for appointments more than a dozen times and left early unannounced once since November 2021. Appellant noted that the program had recently been placed on hiatus due to a Kaiser labor strike.

The report further documented CONREP's efforts to verify appellant's volunteer work at the homeless shelter. The shelter's program manager was unaware of appellant, but a program directed at the shelter clarified that appellant was a frequent volunteer for one to two hours weekly through approximately mid-June 2022 and occasionally since then. CONREP observed that "the drop-off in [appellant's] participation roughly coincide[d] with her drop-off from Kaiser [Intensive Outpatient Program] services" and expressed concern that appellant chose to report incorrect information about the frequency of her activities.

The report identified several barriers to appellant's outpatient treatment that raised "serious concerns about [appellant's] current fitness for effective and safe outpatient community treatment . . . ." According to CONREP, she "demonstrated behavior that prioritized appearance rather than reflected reality," such as her alleged overstatements of her involvement with the Kaiser program and her own volunteerism. Most significant to CONREP was appellant's acknowledgment that she traveled out of state monthly to Nevada to see her young son, given a condition of her supervised release was that she would not leave the state without court permission and because she had appeared to "inflate[] the extent to which she ha[d] actually been going to visit her son." She informed CONREP she made monthly visits, but the ex-husband stated she made the trip "3 to 4 times." The report stated, "[Appellant's] apparent effort to present a desirable image to CONREP at the expense of accurate reporting is a barrier to safe community treatment."

In concluding, the report noted that "the nature of the charges, injuries sustained, inconsistent reporting, inability to follow through with current probation terms and conditions, questionable insight into her mental health illness and lack of account of instant offense continues to be of concern." CONREP concluded, "There is no facility setting other than the California Department of State Hospitals (DSH) that is appropriate for [appellant's] treatment." As such, CONREP recommended appellant "be committed to Inpatient Treatment with the California Department of State Hospitals." (Bold omitted.)

### Supplemental Reports and Placement Hearing

Following the filing of the CONREP Report, the placement hearing was continued at defense counsel's request to allow appellant time to provide

CONREP additional information to fill gaps identified in the placement report.

The following materials were subsequently filed by the parties:

*Report from Appellant's Private Therapist.*

In a 7-page letter (excluding attachments) rebutting the CONREP report, appellant's private therapist stated that CONREP never attempted to interview her, ask about appellant's treatment, or request records. She treated appellant on a weekly basis and addressed accountability for the instant offense and community safety as part of her treatment. According to the therapist, it was CONREP's fault that appellant's mother was not interviewed since CONREP knew it had the wrong number and delayed getting the correct one. In addition, CONREP overly relied on the ex-husband as an information source because he was biased against appellant; there had been acrimony between the two since their separation in 2016 and he had previously been given a warning citation for allegedly assaulting appellant. She noted appellant had apologized to her son multiple times while visiting him in his therapy sessions, during which the ex-husband was not present. The therapist's response elaborated on appellant's volunteer work, her completion of more than 150 hours of group therapy at Kaiser, and her weekly individual psychotherapy. The therapist also found "no basis for concern for [appellant's] safety or the safety of others." She had administered a psychological test to appellant, and "her results were consistent with a mentally stable person." In the therapist's view, committing appellant to the state hospital would be inappropriate.

*Letters from Appellant and Her Friends and Family.*

On November 14, 2022, the court received a letter from appellant and letters from her boyfriend, a friend, her minister, the homeless shelter, and her mother in support of appellant's outpatient treatment.

*CONREP Addendum to Initial Recommendation.*

CONREP explained that it did not find in appellant's therapist's submissions any information which overrode its concerns that appellant was not forthright in her reporting during her clinical interview and had violated the terms and conditions of her supervised release by traveling out of state without court permission or notice to probation. CONREP questioned whether appellant's conduct during supervised release reflected her inability to understand and appreciate the importance of following conditions for outpatient treatment. The recommendation for commitment to inpatient treatment with DSH remained unchanged.

*Appellant's Private Therapist's Proposed Treatment Plan.*

After reviewing appellant's treatment over the 18 months since the offense and observing that appellant was "mentally well and no longer suffer[ing] the mental health symptoms that precipitated the suicide attempt . . . ," appellant's therapist recommended a treatment approach adhering to a standard of care recognizing the importance of " 'continuity of care' " adopted by the therapeutic community and CONREP. Her proposed treatment consisted of appellant continuing with her current mental health providers with the providers reporting to CONREP; ongoing reporting to probation by appellant; and home visits and group therapy provided by CONREP. As an alternative, the therapist stated the " 'intensive out-patient' model used by CONREP would be satisfactory." She strongly disagreed with CONREP's recommendation that appellant be referred to the state hospital

for treatment, opining that the recommendation to be "extremely unwarranted and pos[ing] a high risk of eminent danger" to appellant.

The People also filed a motion to revoke appellant's supervised release based on her unpermitted out of state travel to Nevada without obtaining permission of the court.

At the placement hearing on November 17, 2022, and following arguments from counsel, the court ordered appellant to be committed to Napa State Hospital for a period not to exceed 10 years, 6 months, or until mental competency has been restored. The court further permitted appellant to remain out of custody on supervised release while CONREP explored possible alternative placement facilities.

This appeal followed.

## DISCUSSION

Appellant argues the trial court erred in committing her to the state hospital because it was unaware of its discretion to place her in an outpatient facility, and it also failed to exercise its discretion to order outpatient treatment for her. We disagree.[2]

Section 1026 provides that if a defendant is found not guilty of a crime by reason of insanity, "the court . . . shall direct that the defendant be committed to the State Department of State Hospitals for the care and treatment of persons with mental health disorders or any other appropriate public or private treatment facility approved by the community program director, or the court may order the defendant placed on outpatient status pursuant to Title 15 (commencing with Section 1600) of Part 2." (§ 1026,

---

[2] Appellant disputes the applicable standard of review, urging we review the trial court's commitment order de novo rather than under an abuse of discretion standard. We need not resolve this issue because, as described below, we conclude there was no error under either standard.

9

subd. (a).)  Before ordering a defendant's commitment, the court "shall order the community program director or a designee to evaluate the defendant and to submit . . . a written recommendation as to whether the defendant should be placed on outpatient status or committed to the State Department of State Hospitals or other treatment facility."  (§ 1026, subd. (b).)

Under section 1600, "[a]ny person committed to a state hospital or other treatment facility under section 1026 . . . may be placed on outpatient status from that commitment subject to the procedures and provisions of this title."  (§ 1600.)

Under section 1601(a), when a person is found not guilty by reason of insanity of "any felony involving death, great bodily injury, or any act which poses a serious threat of bodily harm to another person, outpatient status under this title shall not be available until that person has actually been confined in a state hospital or other treatment facility for 180 days or more . . . , unless the court finds a suitable placement, including, but not limited to, an outpatient placement program, that would provide the person with more appropriate mental health treatment and the court finds that the placement would not pose a danger to the health or safety of others."  (§ 1601, subd. (a).)

Here, there is no dispute that the court found section 1601(a) applied to appellant's placement because appellant had pled no contest to a felony and admitted the allegation of great bodily injury to a child under 5 years old. Instead, appellant argues that the court was "completely mistaken in its understanding of the law" and "unaware of its clear discretion to grant [her] outpatient status" when the court stated appellant's offense required her to be committed to the state hospital for 180 days or more, only after which the court could consider outpatient placement.  Not so.  At the placement

hearing, the following exchange occurred as the court announced its ruling on appellant's placement:

THE COURT: So to me, it's a pretty clear-cut issue. I have a felony involving great bodily injury. And it requires that a person be committed, confined to state hospital for 180 days or more. And then after that time, we can consider out-patient.

DEFENSE COUNSEL: The court is misstating the law. I apologize for interrupting.

THE COURT: I'm sorry?

DEFENSE COUNSEL: I think the court is misstating the law. It absolutely does not require that. You have the authority to grant out-patient at the outset.

THE COURT: So I'm not done.

DEFENSE COUNSEL: Okay. I apologize.

THE COURT: So any felony involving death or great bodily injury, which we do have in this case, does require at this point – and poses serious threat of bodily harm to another person, is another consideration does require at this point shall not be available – out-patient shall not be available until the person has actually been confined in the state hospital or other treatment facility for 180 days or more, *unless the court finds a suitable placement*. [¶] And, again, I think the conversation with the Court through CONREP would have been whether they believe there was a suitable placement available, whether that was working through Kaiser and continuing to work with her private therapist. We could have left it at that. [¶] I don't find that working through Kaiser, given the information that I have, that she has not – [Appellant] has not been consistent in her treatment through Kaiser, or working exclusively through this private therapist, in my mind, leaves me

with the comfort or belief that this placement would not pose a danger to the health or safety of others, given the nature of the charges. [¶] And I don't believe that having her continue to work simply with a private therapist or re-engage with Kaiser is going to satisfy this Court in order to overcome, which I believe is a requirement or a presumption under 1601. [¶] So that's my ruling is that she will be housed at a state hospital. (Emphasis added.)

Contrary to appellant's argument based on select excerpts from the hearing, the record of the placement hearing reflects the court was aware of the scope of its discretion. Appellant focuses on the court's comments before counsel interrupted to state the court had misstated the law. But the full record demonstrates the court did not stop its analysis with a conclusion that a commitment to state hospital was required as a matter of law.[3] Instead, tracking the language of section 1601(a), the court expressly explained that "out-patient shall not be available until the person has actually been confined in the state hospital or other treatment facility for 180 days or more, *unless the court finds a suitable placement*." (Emphasis added.) In acknowledging it had the authority to find a suitable placement outside of the state hospital, the court demonstrated it well understood the scope of its discretion.

Moreover, appellant's contention that the commitment order must be reversed and the matter remanded for a new placement hearing for the court to properly exercise its discretion is also misplaced. The court's reasoning

---

[3] Appellant's counsel owes this court a duty of candor. (*Levine v. Berschneider* (2020) 56 Cal.App.5th 916, 921; Cal. Rules of Prof. Conduct, rule 3.3; see Cal. Rules of Court, rule 8.204(a)(2)(C).) That duty includes the obligation to inform the court when material statements of fact are false or misleading. (*Levine*, at p. 921.) Counsel's failure to disclose that the trial court explicitly acknowledged it had the discretion to order outpatient treatment if it found a suitable placement — indeed, counsel left us with the misimpression that "the court was unaware of its clear discretion" — is at odds with this duty of candor.

12

following its recitation of the law under section 1601(a) indicates it found that appellant's treatment through private therapy and/or Kaiser could still pose a danger to the health and safety of others given the nature of appellant's offense.  Again, the court understood the scope of its discretion and exercised that discretion appropriately.

## DISPOSITION

The commitment order is affirmed.

_____
Petrou, J.

WE CONCUR:


_____
Fujisaki, Acting P.J.


_____
Rodríguez, J.


A166703/*People v. Turner*

14